UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

KELLY JEAN FLOYD now known as )
KELLY JEAN LINDERMAN, )
)
Plaintiff, )
)
vs. )       No. 1:16-cv-00104-LJM-DML
)
U.S. BANK NATIONAL )
ASSOCIATION, and )
JOHN  DOES 1-100, INCLUSIVE, )
)
Defendants.

## ORDER ON MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on Defendant U.S. Bank National Association's

("U.S. Bank's"), Motion for Summary Judgment, which seeks to dismiss the Complaint

filed by Plaintiff Kelly Jean Floyd, now known as Kelly Jean Linderman ("Linderman"),

pursuant to the Real Estate Settlement Procedure Act, 12 U.S.C. § 2601, *et seq.*

("RESPA").  Dkt. No. 44.  U.S. Bank claims that it is entitled to summary judgment

because (1) Linderman has not demonstrated that U.S. Bank's failure to comply with

RESPA proximately caused her alleged damages; and (2) the evidence does not

establish that U.S. Bank participated in a pattern of noncompliance with RESPA.  *See*

*generally*, Dkt. No. 45.  In response, Linderman argues that sufficient questions of fact

exist as to whether (1) U.S. Bank's failure to respond to her requests for information

exacerbated physical damage to her real property and caused her continued mental and

1

emotional distress; and (2) U.S. Bank's failure to respond to her requests for information constituted a pattern of noncompliance with RESPA.  *See generally*, Dkt. No. 50.[1]

For the reasons stated herein, the Court **GRANTS** U.S. Bank's Motion for Summary Judgment.

## I. <u>BACKGROUND</u>

In March 2004, Linderman purchased a home located at 2201-2203 North Irwin Street, Indianapolis, Indiana, 46219 (the "Home").  Dkt. No. 1, Ex. A; Dkt. No. 45, Ex. A ("Linderman Dep."), 17:20-19:17.  Linderman moved into the main portion of the Home with her former husband, the father of her children, and her four children; her parents also moved into the smaller in-law suite connected to the Home.  Linderman Dep., 19:2-6.  To purchase the Home, Linderman obtained a mortgage from Mortgage Express, Inc., which then assigned the mortgage to U.S. Bank.  Dkt. No. 1, Exs. A & C.  Linderman's brother, Scott Floyd, co-signed the mortgage with Linderman to help her purchase the Home, but he did not contribute to the cost of the Home.  Linderman Dep., 19:18-20:5.

Linderman lived in the Home from March 2004 until June 2013, when her mother asked her to move out due to family conflict.  *Id.* at 17:20-18:18, 73:7-10.  Although Linderman struggled to make mortgage payments between 2006 and 2007 after her father passed away and her mother's retirement, *id.* at 20:21-21:3, she paid the mortgage for the Home until she moved out in June 2013.  *Id.* at 73:7-10.  Linderman's mother and daughter continued to live in the Home after Linderman left in June 2013, and Linderman,

---

[1] Linderman also filed a Surreply in response to U.S. Bank's Motion for Summary Judgment on March 1, 2017.  Dkt. No. 56.  U.S. Bank filed its Motion to Strike Surreply on March 2, 2017.  Dkt. No. 58.  The Court **GRANTS** U.S. Bank's Motion to Strike Surreply, and Linderman's Surreply was not considered in the Court's decision regarding U.S. Bank's Motion for Summary Judgment.

believing her mother would take over the payments, stopped paying the Home's mortgage. *Id.* at 71:19-72:15-18, 73:7-10. Linderman's mother left the Home in July or August 2013, but Linderman's daughter continued to live in the Home, paying rent to Linderman's mother, until May 2014. *Id.* at 71:12-24. The Home sat vacant after Linderman's daughter moved in May 2014. *Id.* Upon learning that her daughter was moving out of the Home in May 2014, Linderman also discovered that her mother had stopped paying the mortgage. *Id.* at 71:25-73:10.

On March 25, 2014, U.S. Bank initiated a foreclosure action on the Home in Indiana state court. *Id.* at 70:8-71:11; Complaint, *U.S. Bank National Assoc. v. Floyd*, No. 49D12-1403-MF-009869 (Ind. Sup. Mar. 25, 2014). Linderman claims her brother received the service of process for the foreclosure action but never informed her of the foreclosure. Linderman Dep., 72:19-74:13. The Indiana state court initially entered a default judgment against Linderman on January 13, 2015, Order Granting Default Judgment, *U.S. Bank National Assoc. v. Floyd*, No. 49D12-1403-MF-009869 (Ind. Sup. Jan. 13, 2015), but the default judgment was set aside as to Linderman on June 17, 2015. Order to Set Aside Default Judgment, *U.S. Bank National Assoc. v. Floyd*, No. 49D12-1403-MF-009869 (Ind. Sup. June 17, 2015). Linderman's brother also quitclaimed his interest in the Home to Linderman on May 26, 2015. Dkt. No 1, Ex. B; Linderman Dep., 21:4-18.

On July 27, 2014, Linderman, who was planning to move back into the Home, went to clean the Home and discovered that it had been vandalized. Linderman Dep., 21:23-22:9, 27:8-9. After discovering the vandalism, Linderman called the police, a preservation company known as Five Brother's Property Management Company ("Five Brother's"), and her relationship manager with U.S. Bank. *Id.* at 25:20-26:3, 40:24-41:10.

3

Linderman's insurance company also came out to the Home to inspect the damage caused by the vandalism. *Id.* at 27:2-4. Linderman, who was already behind on payments and was on a limited income, became concerned about the costs associated with repairing the Home after this vandalism. *Id.* at 25:5-11.

Approximately one week after the first vandalism, Linderman discovered that the Home had been vandalized a second time. *Id.* at 27:10-13. Linderman found that the vandals had cut a hole in the floor and had gotten into the Home's crawlspace to take all of the Home's copper piping and wiring. *Id.* at 28:18-29:11. Linderman called the police, but the police told her that she needed to secure the Home and to stop wasting their time. *Id.* at 29:21-30:1. She also called U.S. Bank, which informed her that she needed to contact her insurance company to make a claim. *Id.* at 30:10-12. A few days later, Linderman discovered that the Home was vandalized again after finding graffiti painted on the Home's exterior walls. *Id.* at 30:5-7.

Although she had not yet hired anyone to perform the necessary repairs, Linderman drove by the Home in October 2014, and found Five Brother's discarding items from the Home into a large dumpster in the yard. *Id.* at 40:6-23, 44:13-19. Five Brother's, which Linderman believed were working on behalf of U.S. Bank, had gone to perform repair work on the Home. *Id.* at 40:20-23, 44:4-6. When Linderman called U.S. Bank to discuss the actions of Five Brother's, U.S. Bank denied authorizing Five Brother's to work on the Home and advised Linderman to file a police report and call her insurance company if she discovered anything had been stolen. *Id.* at 41:22-25, 45:16-46:2.

On January 16, 2015, Linderman selected R&S Contracting, Inc. ("R&S"), to repair the Home. *Id.* at 49:21-50:7, 51:3-18; Dkt. No. 45, Ex. 4. Although other contractors had

estimated that the total cost of the Home's repairs would range between $104,000.00 and $163,000.00, Linderman Dep., 66:6-16, R&S contracted to complete the repairs for $35,700.00.  Dkt. No. 45, Ex. 4.

On January 30, 2015, in light of her selection of R&S, Linderman sent a fax to U.S. Bank containing several documents associated with her contractor selection (the "January 30 Fax"), including a Declaration of Intent to Complete Repairs signed by Linderman, a Contractor's Statement signed by R&S, Linderman's contractor agreement with R&S, a W-9 tax form for R&S, R&S's Certificate of Liability Insurance, R&S's Contractor's License, and a list of items that were either damaged or missing from the Home.  Dkt. No. 50, Ex. 1 ("Linderman Aff."), Ex. A.  U.S. Bank, which maintained an escrow account containing the insurance proceeds paid as a result of Linderman's insurance claims related to the vandalisms, disbursed $10,000.00 from Linderman's escrow account to pay to R&S.  Linderman Dep., 56:2-24; 62:9-13.  On April 13, 2015, R&S informed Linderman that it would not finish the repairs for the Home because it could not verify that Linderman had sufficient funds to pay for its work.  *Id.* at 57:7-20.

On April 15, 2015, only two days after R&S stopped its work, Linderman discovered the Home had been vandalized yet again.  *Id.* at 62:19-20; Dkt. No. 45, ¶ 19. The Home was vandalized for a fifth time on May 20, 2015.  Dkt. No. 45, ¶ 19.  In addition to the vandalisms, the Home sustained significant storm damage in June 2015, specifically to the roof.  Linderman Dep., 67:19-68:3.

Moreover, Linderman was cited for several ordinance violations from the City of Indianapolis (the "City") in July, August, and October 2015, relating to her ownership of a nuisance property and her failure to properly secure the Home.  *Id.* at 68:14-69:7; Dkt.

5

No. 45, ¶¶ 22-23, 28.  The City issued an Order to Board the Home on November 13, 2015.  Dkt. No. 1, Ex. G.  Linderman estimates that she has approximately $5,000.00 in outstanding fees due as a result of the multiple code violations, and she has made several efforts to secure the Home and prevent additional violations.  Linderman Dep., 69:8-24.

Linderman, who had hoped to move into the Home before discovering the first vandalism, struggled to find stable housing while waiting for the Home to be repaired.  *Id.* at 78:3-85:6.  Because the initial vandalisms rendered the Home uninhabitable, the Home remained vacant, and Linderman was forced to find other housing options.  *Id.* at 39:15-40:5.  Shortly after marrying her new husband ("Mr. Linderman") on November 13, 2014, Linderman moved with Mr. Linderman to his hometown of Kalamazoo, Michigan, until February 2015.  *Id.* at 78:3-80:5.  Linderman stated that the couple went to Kalamazoo largely because the Home was uninhabitable.  *Id.* at 80:24-81:8.  When Linderman and Mr. Linderman returned to Indianapolis in February 2015, they moved into an extended stay hotel because they could not return to the Home.  *Id.* at 81:12-17.  However, after April 17, 2015, the couple did not have enough money to stay at the extended stay hotel any longer and were forced to move into a shed on Linderman's former father-in-law's property.  *Id.* at 82:20-83:3.  Linderman and Mr. Linderman lived in an apartment for a short time but left due to the apartment's poor condition.  *Id.* at 81:18-25.

The couple often argued about their living arrangements and their inability to repair the Home.  *Id.* at 83:13-84:10.  In August 2015, Linderman purchased another home adjacent to the Home using an inheritance from her uncle, but the close proximity to the Home reminded Mr. Linderman of the problems it had created for them and actually intensified the couple's marital problems.  *Id.* at 84:20-85:9.  Upon Mr. Linderman's

6

suggestion, the couple began martial counseling on September 29, 2015, to address their issues, including those related to the Home and their different parenting styles. *Id.* at 84:11-86:18.  Linderman, however, filed for divorce on November 14, 2015. *Id.* at 85:11-13.  In addition to her martial concerns, Linderman also began treatment for bipolar disorder, depression, and anxiety in August 2015, and she believes that such treatments would not have been necessary if her problems relating to the Home had been resolved earlier that year.  Linderman Aff., ¶¶ 21-22, Exs. H & I; Linderman Dep., 87:16-88:8.

In light of her difficulties with the Home and paying for its repairs, Linderman sent a letter to U.S. Bank on September 9, 2015, addressing her grievances and requesting several pieces of information relating to her mortgage on the Home (the "September 9 Letter").  Linderman Aff., Ex. B.  Specifically, Linderman indicated that she had not been receiving timely information regarding her loan and complained about the Five Brother's work on the Home without her permission.  September 9 Letter, ¶¶ 1-2, 4, 6.  Moreover, Linderman asked for a written explanation of changes made to her loan and for information regarding how the insurance proceeds in her escrow account were being utilized. *Id.* at ¶¶ 3, 5.  Although Linderman admitted that she received letters from U.S. Bank dated September 11, and 18, 2015, acknowledging U.S. Bank's receipt of the September 9 Letter, Linderman denied receiving a letter from U.S. Bank dated September 25, 2015, responding to her requests in the September 9 Letter prior to this litigation. Linderman Dep., 75:18-76:12; Linderman Aff., Ex. D.

Linderman filed her Complaint against U.S. Bank on January 14, 2016. *See generally*, Dkt. No. 1.  Specifically, Linderman alleges that U.S. Bank violated RESPA by

7

failing to respond to Linderman's qualified written requests, entitling her to actual and statutory damages.  *Id.*

## II.  **SUMMARY JUDGMENT STANDARD**

As stated by the Supreme Court, summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the federal rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *see also United Ass'n of Black Landscapers v. City of Milwaukee*, 916 F.2d 1261, 1267-68 (7th Cir. 1990).  Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure, which provides in relevant part: "The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials showing that a fact either is or cannot be genuinely disputed.  Fed. R. Civ. P. 56(c)(1).  A genuine issue of material fact exists whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, (1986).  The nonmoving party bears the burden of demonstrating that such a genuine issue of material fact exists.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986); *Oliver v. Oshkosh Truck Corp.,* 96 F.3d 992, 997 (7th Cir. 1996).  It is not the duty of the Court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying applicable

evidence. *See Bombard v. Ft. Wayne Newspapers, Inc.,* 92 F.3d 560, 562 (7th Cir. 1996).

In evaluating a motion for summary judgment, the Court should draw all reasonable inferences from undisputed facts in favor of the nonmoving party and should view the disputed evidence in the light most favorable to the nonmoving party. *See Estate of Cole v. Fromm,* 94 F.3d 254, 257 (7th Cir. 1996). The mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment. *See Anderson,* 477 U.S. at 248; *JPM Inc. v. John Deere Indus. Equip. Co.,* 94 F.3d 270, 273 (7th Cir. 1996). Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute. *See Clifton v. Schafer,* 969 F.2d 278, 281 (7th Cir. 1992). If the moving party does not have the ultimate burden of proof on a claim, it is sufficient for the moving party to direct the Court to the lack of evidence as to an element of that claim. *See Green v. Whiteco Indus., Inc.,* 17 F.3d 199, 201 & n. 3 (7th Cir. 1994). "If the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party." *Ortiz v. John O. Butler Co.,* 94 F.3d 1121, 1124 (7th Cir. 1996).

### III. <u>ANALYSIS</u>

Linderman alleges that U.S. Bank violated RESPA, specifically 12 U.S.C. § 2505(e), by failing to timely respond to her qualified written requests ("QWRs") and that she is therefore entitled to actual and statutory damages under 12 U.S.C. § 2605(f). Dkt. No. 1, ¶¶ 48-70. Under 12 U.S.C § 2605(e), when a mortgage loan servicer "receives a

qualified written request from [a] borrower," the servicer must "provide a written response acknowledging receipt of the correspondence" within five days.   12 U.S.C. § 2605(e)(1)(A).   The mortgage loan servicer must also work to do one of the following within thirty days after receiving the QWR: (1) correct any inaccurate account information and notify the borrower of the correction in writing; (2) provide the borrower with a written explanation stating why their account information is correct; or (3) provide the borrower with a written explanation indicating that the information requested is unavailable.   12 U.S.C. 2605(e)(2).  If a mortgage loan servicer fails to comply with the requirements of 12 U.S.C. § 2605, an individual borrower may be entitled to any actual damages he or she has sustained "as a result of the failure" and statutory damages, "as the court may allow, in the case of a pattern or practice of noncompliance" with 12 U.S.C. § 2605, "in an amount not to exceed $2000."  12 U.S.C. § 2605(f).

## A.  LINDERMAN'S QUALIFIED WRITTEN REQUESTS

For a borrower to have a QWR subject to 12 U.S.C. § 2605(e), the borrower must submit "a written correspondence, other than a notice on a payment coupon or other payment medium supplied by the servicer" that identifies the borrower's name and account and that states the reasons he or she believes "that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower."  12 U.S.C. § 2605(e)(1)(B).  While no specific magic language is required, the written communication must request information regarding the borrower's account to be deemed a QWR.  *See Catalan v GMAC Mortg. Corp.*, 629 F.3d 676, 687 (7th Cir. 2011) ("Any reasonably stated written request for account information can be a qualified written request.").  The Seventh Circuit recently clarified the definition of a QWR, by stating that

10

RESPA "covers only written requests alleging an account error or seeking information relating to loan servicing." *Perron v. J.P. Morgan Chase Bank, N.A.*, 845 F.3d 852, 857 (7th Cir. 2017).  "Servicing" is defined under RESPA as the "receiving [of] any periodic payments from a borrower pursuant to the terms of any loan, including amounts for escrow accounts …, and making the payments of principal and interest and such other payments with respect to the amounts received from the borrower as may be required by the terms of the loan." *Id.* (internal quotations omitted).

Linderman asserts that the January 30 Fax was a QWR; the Court cannot agree. The January 30 Fax fails to meet the requirements for a valid QWR because it does not allege an account error and does not request any information from U.S. Bank.  Instead, it merely provides U.S. Bank with information relating to Linderman's agreement with her selected contractor, R&S.  *See* Linderman Aff., Ex. A.  Therefore, even in the broadest permissible sense, the January 30 Fax cannot qualify as a QWR under RESPA.

Linderman also asserts that the September 9 Letter was a QWR.  Determining whether that correspondence serves as a valid QWR, however, presents a more difficult question for the Court in light of the most recent precedent available, *Catalan* and *Perron*. While Linderman clearly seeks information from U.S. Bank regarding her loan in the September 9 Letter, it is not as clear as to whether the September 9 Letter actually requests information related to the servicing of the loan, as required under *Perron*. However, the Court need not determine whether the September 9 Letter meets the requirements for a QWR because, even assuming *arguendo* that it is a QWR under 12 U.S.C. § 2605(e), Linderman has not established that U.S. Bank's failure to respond to

the September 9 Letter proximately caused Linderman's alleged harms or that it was part

of a pattern or practice of noncompliance with RESPA.

## B. CAUSATION OF ACTUAL DAMAGES

Linderman seeks recovery for actual damages she incurred, including severe

mental and emotional damages that caused her to begin treatment for depression, bipolar

disorder, and anxiety and that led to her divorce from Mr. Linderman, in addition to

continued physical damages to the Home.  Dkt. No. 1, ¶ 69; Dkt. No. 50 at 8.  Linderman

alleges that her damages were exacerbated by U.S. Bank's failure to respond to the

September 9 Letter and to disperse funds to repair the Home, but she has not provided

any evidence demonstrating that she sustained any damages "as a result of" U.S. Bank's

failure to comply with RESPA.  12 U.S.C. § 2605(f)(1).

When a plaintiff seeks actual damages under 12 U.S.C. § 2605(e), he or she must

demonstrate that a causal connection exists between the injuries alleged and the

defendant loan servicer's failure to respond to a QWR.  *See Diedrich v. Ocwen Loan

Serv., LLC*, 839 F.3d 583, 592 (7th Cir. 2016).  Therefore, even if the Court were to find

that Linderman suffered damages, she must still prove that her damages were specifically

caused by U.S. Bank's inadequate response to a QWR.  *Id.* at 593 (finding that a district

court did not err when granting summary judgment to a defendant loan servicer because

the plaintiff borrowers "failed to demonstrate the essential element that they were injured

specifically by [the loan servicer's] inadequate response to a request for information under

RESPA § 2605(e)(2)").

Although Linderman claims that U.S. Bank's failure to respond to the September

9 Letter caused her continued mental and emotional distress and exacerbated the

physical damage to the Home, Dkt. No. 50 at 11-12, she began incurring these harms when the Home was first vandalized in July 2014, well before she sent the September 9 Letter. *See* Linderman Dep., 25:5-11. Moreover, Linderman admitted that she could not afford to fix the Home after the multiple vandalisms and storm damage to the Home and began experiencing emotional distress as a result of her lack of financial resources. *Id.* at 80:22-88:8; Dkt. No. 50 at 9-10. Linderman further claims that her continued harm could have been avoided if U.S. Bank had released the insurance funds held in escrow and that a timely response from U.S. Bank would have provided her relief by (1) allowing her to receive the insurance funds held in escrow, (2) directing her to pursue other recourse with U.S. Bank, or (3) simply better informing her about the status of her escrow account. Linderman Dep., 96:8-12; Dkt. No. 50 at 10-13.

Despite the harm alleged, Linderman has not demonstrated how her damages are causally linked to U.S. Bank's failure to respond to the September 9 Letter. While Linderman asserts that her damages could have been minimized if U.S. Bank had dispersed funds to her to repair the Home, she does not provide any evidence proving that U.S. Bank's failure to respond directly caused the frequent vandalisms and storm damage to the Home, or her emotional distress and concomitant relationship issues. Because Linderman's alleged damages were incurred well before she sent the September 9 Letter, no reasonable trier of fact could find that her damages were the result of U.S. Bank's alleged failure to respond to the September 9 Letter. Furthermore, while a plaintiff can recover emotional distress damages under RESPA, harms associated with the breakdown of a marriage, like those alleged by Linderman, are "far too attenuated from the alleged violation" to support an award of actual damages. *Perron*, 845 F.3d at

13

858.  Therefore, because Linderman cannot prove that her alleged damages are causally connected to U.S. Bank's failure to respond to the September 9 Letter, she is not entitled to an award of actual damages.

## C.  STATUTORY DAMAGES

For a plaintiff to receive statutory damages under 12 U.S.C. § 2605, he or she must demonstrate that the defendant loan servicer has participated in "a pattern or practice of noncompliance" with the statute.  12 U.S.C. § 2605(f)(2).  Because the January 30 Fax did not request any information from U.S. Bank and cannot be considered a QWR, U.S. Bank's alleged failure to respond to the September 9 Letter is the only instance of U.S. Bank's noncompliance with 12 U.S.C. § 2605 at issue.  Therefore, Linderman cannot prove that U.S. Bank's alleged failure to respond to her requests for information represents a pattern or practice of noncompliance, rather than a singular incident of alleged misconduct.  Without demonstrating that U.S. Bank's failure to respond was part of a pattern or practice of noncompliance, Linderman is not be entitled to statutory damages under RESPA as a matter of law.

## IV. **CONCLUSION**

For the foregoing reasons, the Court **GRANTS** U.S. Bank's Motion for Summary Judgment.  Furthermore, because Linderman failed to identify John Does 1-100 before the close of discovery, the Court also **DISMISSES without prejudice** John Does 1-100. *See Williams v. Rodriguez*, 509 F.3d 392, 402 (7th Cir. 2007).  Judgment will be entered accordingly.

IT IS SO ORDERED this 16th day of March, 2017.

_____
LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Steven Christopher Striebeck
cstriebeck@striebecklaw.com

R. Steven McCrosson
MCCROSSON & ASSOCIATES
rsmclaw@gmail.com

Tammara Danielle Porter
TAFT STETTINIUS & HOLLISTER LLP
tporter@taftlaw.com

Timothy C. Sullivan
TAFT STETTINIUS & HOLLISTER LLP
sullivan@taftlaw.com